**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────

| | |
|---|---|
| **IN RE MYOVANT SCIENCES LTD. SECTION 16(b) LITIGATION** | **20-cv-1807 (JGK)**<br>**20-cv-2542 (JGK)**<br><br>**OPINION AND ORDER** |

────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

The plaintiffs, shareholders of Myovant Sciences Ltd. ("Myovant"), brought this derivative action on behalf of Myovant pursuant to the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78a et seq. The plaintiffs allege that Roivant Sciences Ltd. ("Roivant"), a holder of approximately 45% of Myovant's common stock, bought and sold shares of Myovant's stock within a six-month window, thus making a short-swing profit in violation of Section 16(b) of the Act, 15 U.S.C. § 78p(b). Roivant moves to dismiss the action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons explained below, the motion is **granted.**

I

The following facts are drawn from the Second Amended Complaint ("SAC") and are accepted as true for the purposes of this motion.

On September 6, 2019, Roivant entered into a "Memorandum of Understanding" (the "MOU") with Sumitomo Dainippon Pharma Co., Ltd. ("Sumitomo") to create a strategic alliance. SAC ¶ 14. As

part of the transaction, among other terms, Sumitomo was to acquire all shares of Myovant held by Roivant which were equivalent to roughly 45% of Myovant's publicly outstanding common stock. SAC ¶ 15. Additionally, the MOU contemplated a sale of equity of Roivant, equity in another company held by Roivant, Roivant's interest in several subsidiaries, options to purchase certain other subsidiaries and affiliates of Roivant, and rights to certain technology platforms developed by Roivant. SAC ¶¶ 15-18. In exchange for this package of assets, Sumitomo agreed to make a cash payment of $3 billion to Roivant. SAC ¶ 19.

As part of the subsequent Transaction Agreement signed on October 31, 2019, Roivant agreed to a condition precedent to closing that Sumitomo would be able to consolidate Myovant in its financial statements when the transaction closed. SAC ¶ 24. To facilitate consolidation, Roivant agreed to transfer not less than a majority of Myovant's common stock and to acquire additional shares of Myovant necessary to increase its ownership to over 50%. SAC ¶ 25. In order to fulfill this condition, Roivant purchased additional shares of Myovant between the execution of the Transaction Agreement and the closing of the transaction on December 27, 2019 (the "Top-Up Shares"). Specifically, on November 25, 2019, Roivant purchased a block of 3,500,000 shares of Myovant in a private transaction for $15.00

2

per share and purchased the remaining 743,005 shares in several open-market transactions at prices ranging from $11.80 to $18.85, between November 20, 2019 and December 17, 2019. SAC ¶¶ 29-30. These prices were significantly above the $5.46 price per share of Myovant stock on public exchanges on the date of the Transaction Agreement, at least in part due to a material positive clinical trial result announced by Myovant on November 19, 2019. SAC ¶¶ 41-42.

The Top-Up Shares were delivered to Sumitomo at the closing of the transaction on December 27, 2019. SAC ¶ 32. No cash was paid for the Top-Up Shares. Id. Under the Transaction Agreement, Sumitomo's payment obligations had been limited to the shares already owned by Roivant as of the agreement date. Id. Instead, the rights in the Top-Up Shares were governed by a "Share Return Agreement" signed at the closing of the transaction, pursuant to which Sumitomo acquired legal title to the shares, while Roivant retained all pecuniary benefits of ownership, along with the right to acquire the shares back to the extent that Sumitomo succeeded in acquiring sufficient Myovant shares on its own to maintain majority ownership. SAC ¶ 34.

The plaintiffs allege that these transactions amounted to a short-term swing profit by an insider in violation of Section 16(b). They allege that the purchases of the Top-Up Shares of Myovant can be matched with the sale of Myovant shares that

occurred as part of the transaction with Sumitomo, even if the Top-Up Shares were never sold. SAC ¶ 32-34, 37. Furthermore, the plaintiffs allege that the public market price of Myovant shares at the time of the execution of the Transaction Agreement is a poor measure of the price at which Roivant sold its shares of Myovant because it did not reflect (a) the control premium that Sumitomo had bargained for and (b) the material clinical trial results that they contend Roivant "would have been crazy to hide" from Sumitomo, and that were ultimately announced publically on November 19, 2019. SAC ¶ 41, 42-45. The plaintiffs estimate that the sale price was $22.0915. SAC ¶ 48.

## II

In deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a district court may consider evidence outside the pleadings. Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). When evaluating whether a plaintiff has constitutional standing to sue, the courts "borrow from the familiar Rule 12(b)(6) standard, construing the complaint in plaintiff's favor and accepting as true all material factual allegations contained therein."

Donoghue v. Bulldog Inv'rs Gen. P'ship, 696 F.3d 170, 173 (2d Cir. 2012).

In deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the

5

complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

### III

As an initial mater, the Court must address Roivant's argument that the plaintiffs do not have standing to bring their claims under Section 16(b). See United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999) ("Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit.").[1]

"[T]he irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v Robins, 136 S. Ct. 1540, 1547 (2016) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). "Injury in fact [is] an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. In Spokeo, the Supreme

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

Court clarified that "Article III standing requires a concrete injury even in the context of a statutory violation" 136 S. Ct. at 1549. Therefore, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Id. As a result, an alleged "bare procedural violation, divorced from any concrete harm," does not always "satisfy the injury-in-fact requirement of Article III." Id. But when the "particular procedural violations alleged . . . entail a degree of risk [of harm] sufficient to meet the concreteness requirement," id. at 1550, "a plaintiff . . . need not allege any additional harm beyond the one Congress has identified," id. at 1549 (emphasis in original). Thus, a plaintiff suing for a procedural violation can satisfy the concreteness requirement either by pleading that a distinct concrete injury resulted from that violation, id., or by demonstrating that the violation entailed a "risk of real harm" "sufficient to meet the concreteness requirement," id. at 1549, 1550.  After Spokeo, the Second Circuit Court of Appeals has explained that "whether the particular procedural violations alleged . . . entail a degree of risk sufficient to meet the concreteness requirement . . . depends on whether the particular bare procedural violation may present a material risk of harm to the underlying concrete interest Congress sought to protect in

7

enacting the statutory requirement." Katz v. Donna Karan Co. Store, L.L.C., 872 F.3d 114, 118 (2d Cir. 2017). Accordingly, a plaintiff can have standing to sue for "a bare procedural violation of law" if and only if (1) "Congress conferred the procedural right to protect a plaintiff's concrete interests as to the harm in question," and (2) "the procedural violation presents a risk of real harm to that concrete interest." Katz, 872 F.3d at 119. See also Crupar-Weinmann v. Paris Baguette Am., Inc., 861 F.3d 76, 80-81 (2d Cir. 2017); Strubel v. Comenity Bank, 842 F.3d 181, 190 (2d Cir. 2016).

To support their Article III standing, the plaintiffs rely on Donoghue v. Bulldog Investors General Partnership, in which the Court of Appeals for the Second Circuit held that "short-swing trading in an issuer's stock by a 10% beneficial owner in violation of Section 16(b) of the Securities Exchange Act causes injury to the issuer sufficient for constitutional standing." 696 F.3d 170, 180 (2d Cir. 2012). Roivant argues that the opinion in Bulldog is inconsistent with the subsequent guidance from the Supreme Court in Spokeo and that, under Spokeo, the plaintiffs must, and have failed to, demonstrate a concrete injury that resulted from the violation in order to have Article III standing.

Roivant's argument fails because it neglects to take into account the guidance from Spokeo and subsequent Second Circuit

8

cases about the types of procedural violations that satisfy the concreteness requirement on their own due to the risk of harm to the underlying interest protected by the statute in question. See Spokeo, 136 S. Ct. at 1549-50; Strubel, 842 F.3d at 190; Paris Baguette, 861 F.3d at 80-81; Katz, 872 F.3d at 118. As a result, plaintiffs suing for procedural violations of this kind "need not allege any additional harm beyond the one Congress has identified." Spokeo, 136 S. Ct. at 1549. And, as the Second Circuit in Bulldog has previously determined, violations of Section 16(b) carry a high risk of harm to the interest that Congress sought to protect. Accordingly, the plaintiffs here need not allege any additional injury.

    Roivant is also incorrect to argue that Bulldog is inconsistent with Spokeo. Even though it was decided before Spokeo, the standing discussion in Bulldog is consistent with the Second Circuit's two-pronged test for statutory violations after Spokeo that a plaintiff can have "standing to sue for a bare procedural violation of law" if (1) "Congress conferred the procedural right to protect a plaintiff's concrete interests as to the harm in question," and (2) "the procedural violation presents a risk of real harm to that concrete interest." Katz, 872 F.3d at 119. First, the court in Bulldog found that Congress passed Section 16(b) to protect a concrete interest: "prevent[ing] the unfair use of information" by corporate

9

insiders. 696 F.3d at 176. The Court of Appeals noted that an issuer—the ultimate plaintiff in interest on whose behalf shareholders can bring a derivative suit under Section 16(b)—has an "interest in maintaining a reputation of integrity, an image of probity, for its § 16(b) insiders and in insuring the continued public acceptance and marketability of its stock." Id. at 177-78. Second, the court in Bulldog found that the trading activities proscribed by Section 16(b) were those in which the "possibility of abuse of inside information was believed to be intolerably great." Id. at 176. In the vocabulary of Spokeo, violations of Section 16(b) were found to present a "risk of real harm," 136 S. Ct. at 1549, to the issuers' interest in their insiders and their securities not being tainted with "unfair use of [inside] information." Bulldog, 696 F.3d at 170. As such, Bulldog shows that violations of Section 16(b) satisfy the two-pronged test for standing to sue for bare procedural violations that the Second Circuit Court of Appeals has used after Spokeo. Indeed, in a Section 16(b) case decided after Spokeo, the Second Circuit Court of Appeals unequivocally reiterated its prior holding in Bulldog. See Klein v. Qlik Techs., Inc., 906 F.3d 215, 220 (2d Cir. 2018) (citing Bulldog for the proposition that "there is a case or controversy in a Section 16(b) case so long as the party bringing suit is either

the corporation that issued the securities in question or a current security holder of that corporation").

Accordingly, the plaintiffs have Article III standing to bring their Section 16(b) claim.

**IV**

Roivant next argues that the plaintiffs failed to state a claim under Section 16(b).

Section 16(b) provides, in part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . . Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter . . . .

15 U.S.C. § 78p(b). "Before liability can attach under 16(b) there must be (1) a purchase and (2) a sale of securities (3) by one who owns more than 10 percent of any one class of the issuer's securities (4) within a six-month period." Newmark v. RKO Gen., Inc., 425 F.2d 348, 354 (2d Cir. 1970). While

11

realization of profit is not a standalone element of Section 16(b), "[i]f there were no profits to disgorge, there would be no relief to grant under Section 16(b)." Rubenstein v. Cosmos Holdings, Inc., No. 19-cv-6976, 2020 WL 3893347, at *10 (S.D.N.Y. July 10, 2020). Accordingly, where a plaintiff "does not allege any facts that indicate that a profit was received, his [Section] 16(b) claim must fail." S. & S. Realty Corp. v. Kleer-Vu Indus., Inc., 575 F.2d 1040, 1044 (2d Cir. 1978).

There is no dispute in this case that Roivant is covered by the statute by virtue of owning more than 10 percent of Myovant's outstanding shares. And there is agreement that some trading occurred within a six-month period. The dispute centers over (1) whether the sales of Myovant stock pursuant to the Transaction Agreement can be matched with Roivant's purchases in anticipation of the transaction, and (2) whether Roivant derived any profit from these transactions that is subject to disgorgement.

The plaintiffs have alleged plausibly that sales and purchases subject to Section 16(b) liability have occurred. Because of the "fungible nature of shares of stock," "the Act does not demand that the same shares should be sold which were bought." Gratz v. Claughton, 187 F.2d 46, 51 (2d Cir. 1951). See also Gibbons v. Malone, 703 F.3d 595, 601 (2d Cir. 2013) ("[B]eing able to match the particular shares bought or sold is

12

wholly irrelevant under [Section] 16(b)"). Not only *may* different shares be matched for purposes of Section 16(b) liability; the law indeed requires "profits for § 16(b) purposes [to be] computed by *arbitrarily* matching purchases with sales in order to obtain the maximum amount of profits." Feder v. Martin Marietta Corp., 406 F.2d 260, 269 (2d Cir. 1969) (emphasis added). Here, Roivant sold one set of shares in the transaction with Sumitomo and, separately, purchased a distinct set of Top-Up Shares. Although the shares that Roivant bought and sold were not the same shares, this is wholly irrelevant under Section 16(b) so long as there were purchases and sales within a six-month period. See Gratz, 187 F.2d at 52 ("[I]f one is looking for an equation of sale and purchase, one may take the same sale and look forward for six months for any purchase at a lower price."). Accordingly, Roivant's argument that there is no matching purchase and sale within the meaning of Section 16(b) is without merit.

    The plaintiffs, however, failed to allege plausibly that these transactions resulted in a profit that is subject to disgorgement pursuant to Section 16(b). The prevailing market prices of Myovant stock at the time of both the MOU and the execution of the Transaction Agreement ($7.51 and $5.46, respectively) was significantly below the prices that Roivant paid for the Top-Up Shares ($11.80 and above). On its face, the

13

sale and purchase therefore did not result in a profit. The plaintiffs allege that the true sale price for Roivant's holdings of Myovant stock must have been significantly higher due to (1) the control premium that Sumitomo achieved in the transaction and (2) the positive clinical trial result for one of Myovant's drugs that Roivant must have shared with Sumitomo. This second allegation, made without any factual support in the SAC, is rendered even less plausible by the fact that Myovant (let alone Roivant, a distinct corporate entity) did not know the results of the trial until after the Transaction Agreement was executed. The plaintiffs are thus basing their theory of profit on unsupported speculation that either Sumitomo signed a binding agreement to pay a significant premium for an asset based on information it would not have until several weeks later or that Myovant correctly predicted the clinical trial results, then shared this prediction with Roivant, who then shared it with Sumitomo. Such elaborate machination is possible, but "without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" Twombly, 550 U.S. at 557.

The plaintiffs claim that discovery of the relevant disclosure schedule may establish the portion of the purchase price allocated to Myovant shares. Failing that, expert testimony may be required on the reasonableness of the

14

allocation or what a correct allocation should be. Compl. ¶ 39. But "it is only by taking care to require allegations that reach the level suggesting [a plausible claim] that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence." Twombly, 550 U.S. at 559. Because their unsupported speculation does not amount to a reasonable foundation, the plaintiffs cannot avoid dismissal by claiming that discovery will reveal a basis for their claim.

Accordingly, the motion to dismiss the claim for failure to state a claim is granted. In their papers, the plaintiffs rely on materials beyond the scope of the SAC and if they wish the Court consider these, they should amend their complaint.

## CONCLUSION

The Court has considered all of the parties' arguments and to the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the motion to dismiss is **granted**. The plaintiffs may file an amended complaint within thirty days of the date of this opinion. The Clerk is directed to close Dkt. Nos. 33 and 37.

**SO ORDERED.**

**Dated:    New York, New York
           January 16, 2021**                    /s/ John G. Koeltl
                                             **John G. Koeltl
                                             United States District Judge**

15