DAVID LOPEZ, ESQ. (DL-6779)
*Lead Attorney for Plaintiffs*
171 Edge of Woods Road
P.O. Box 323
Southampton, New York 11969-0323
Tel: 631.287.5520
Fax: 631.283.4735
Email: davidlopezesq@aol.com

JAMES A. HUNTER, ESQ. (JH-1910)
*Attorney for Plaintiffs*
42 Stagecoach Road
Pipersville, Pennsylvania  18947
Tel: 484.437.5935
Fax: 646.462.3356
Email: hunter@hunterkmiec.com

MIRIAM TAUBER, ESQ. (MT-1979)
*Attorney for Plaintiffs*
885 Park Avenue # 2A
New York, New York  10075
Tel: 323.790.4881
Email: miriamtauberlaw@gmail.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE:**<br>**MYOVANT SCIENCES LTD.**<br>**SECTION 16(b) LITIGATION**<br><br><br>This Document Relates to:<br>ALL ACTIONS | Lead Case: No. 20-cv-1807 (JGK)<br><br>Consolidated with: No. 20-cv-2542 (JGK)<br><br>**THIRD AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**THE PLAINTIFFS**, by their attorneys, complaining of the Defendants, respectfully allege the following upon information and belief except as to Paragraph 2, which Plaintiffs allege on personal knowledge:

**JURISDICTION; NATURE OF ACTION:**

1.     This action arises under the provisions of Section 16(b) of the Securities Exchange Act of 1934, as amended (the "ACT"), 15 U.S.C. § 78p(b), and jurisdiction is conferred upon this Court by Section 27 of the ACT, 15 U.S.C. § 78aa.

**THE PARTIES AND VENUE:**

2.     Plaintiffs are security owners of MYOVANT SCIENCES LTD. ("MYOVANT"), a Bermuda Corporation with principal offices and domicile at 11-12 St. James's Square, Suite 1, Third Floor, London SWIY 4LB, United Kingdom. MYOVANT maintains a subsidiary office in Brisbane, California.

3.     At all times relevant the common stock of MYOVANT was registered under Section 12(b) of the ACT and was and is traded on the New York Stock Exchange located within this district.

4.     MYOVANT is a non-resident alien making venue as against it proper in any district of the United States.

5.     This action is brought in the right and for the benefit of MYOVANT, which is named as a nominal party Defendant solely in order to have all necessary parties before the court.

6.     ROIVANT SCIENCES LTD. ("ROIVANT") is a Bermuda Corporation with principal offices and domicile at 11-12 St. James's Square, Suite 1, Third Floor, London SWIY 4LB, United Kingdom.

7.     At all times relevant (meaning on the dates of ROIVANT's purchases and sales giving rise to Section 16(b) liability, as further described herein), ROIVANT was a more-than-10% beneficial owner of MYOVANT. Additionally, at all relevant times, ROIVANT had the right to appoint a majority of the members of MYOVANT's board of directors, and it actually had three of its representatives seated on MYOVANT's seven-member board. For both reasons, ROIVANT was a so-called "insider" as that term is understood within the meaning of Section 16(b) of the ACT.

8.     ROIVANT is a non-resident alien making venue as against it proper in any district of the United States. Additionally (or alternatively), ROIVANT maintains a subsidiary office in Manhattan in the City of New York.

9.     The purchase by ROIVANT of 3,500,000 MYOVANT shares described in Paragraph 38 was from an entity organized and domiciled in the Commonwealth of Massachusetts. The contract of purchase and sale contains a choice of law clause designating the law of the State of New York as governing.

10.     An additional 743,005 MYOVANT shares, more or less, as recited at Paragraph 39 were purchased by ROIVANT in open market transactions on the New York Stock Exchange or through dark pools or other market facilities located within the District, between November 20, and December 17, 2019.

**STATUTORY REQUISITES:**

11.     The violations of Section 16(b) of the Act to be described herein involve non-exempt securities in non-exempt transactions engaged in by non-exempt persons within the meaning of the ACT.

12.     Demands for prosecution were made on MYOVANT on December 31, 2019, and on January 1, and January 2, 2020. By letters dated February 28, 2020, Matthew Lang, General Counsel and Corporate Secretary of MYOVANT, informed Plaintiffs' counsel that "… the MYOVANT Board of Directors has decided not to pursue remedies against ROIVANT." Further delay by the Plaintiffs in the initiation of suit would have been a futile gesture.

13.     This action is brought within two years of the occurrence of the violations to be described herein, or within two years of the time when reports required by 15 U.S.C § 78p(a) setting forth the substance of the transactions here complained of were first filed with the SEC.

**BACKGROUND:**

      A.    **ROIVANT's Founding Investment in MYOVANT**

14.     ROIVANT is a privately owned firm that acquires and markets late-stage drug candidates through a portfolio of biopharmaceutical companies it calls "Vants."  It operates like a

venture capital fund, founding, seeding, and incubating each Vant with the goal of one day selling it or taking it public.

15.     MYOVANT was one of ROIVANT's Vants. ROIVANT launched MYOVANT under the name "ROIVANT Endocrinology Ltd." in early 2016 to develop pharmaceutical treatments for prostate cancer and endocrine disorders in women. MYOVANT went public in an IPO in October 2016.

16.     ROIVANT owned a majority of MYOVANT's common shares immediately after the IPO, and it beneficially owned more than 10% of MYOVANT's common shares at the time of the sale and purchases giving rise to Section 16(b) liability as further described in this Third Amended Complaint.

## B.     ROIVANT's Sale of Its MYOVANT Shares to Sumitomo

17.     On September 6, 2019, ROIVANT entered into a "Memorandum of Understanding" (the "MOU") with Sumitomo Dainippon Pharma Co., Ltd. ("Sumitomo"), which provided that ROIVANT and Sumitomo planned to execute a transaction in connection with a "strategic alliance." The MOU was filed as Ex. 7.03 to ROIVANT's Schedule 13D/A #2, on Sept. 6, 2019, and is appended as Exhibit A to this Third Amended Complaint.

18.     The transaction contemplated by the MOU was to involve Sumitomo's acquisition of ROIVANT's equity interests in five of its Vants. ROIVANT would accomplish the sale by forming a new holding company, contribute its interest in the five Vants to the holding company, and then sell the holding company's equity (the "Company Equity") to Sumitomo.

19.     Through the sale of the Company Equity, ROIVANT would effectively transfer to Sumitomo the following:

> (i)     all of the shares of MYOVANT stock held by ROIVANT (40,765,599 out of 89,622,626 outstanding shares, equivalent to 45.49% of MYOVANT's common stock);

(ii)  all of the shares of Urovant, another publicly traded company, held by ROIVANT (22,860,013 out of 30,340,432 outstanding shares, equivalent to 75.35% of Urovant's common stock); and

(iii)  three of ROIVANT'S wholly owned Vant subsidiaries (Enzyvant, Altavant, and a third subsidiary later identified as Spirovant).

20.  In addition to the sale of the Company Equity, the MOU provided that ROIVANT would issue and sell to Sumitomo new common shares of ROIVANT giving Sumitomo an 11% interest in ROIVANT (the "ROIVANT Equity").

21.  In addition to the Company Equity and the ROIVANT Equity, the MOU provided that Sumitomo would be granted options to purchase six additional privately held subsidiaries or affiliates of ROIVANT (the "Options"). The terms of the Options were further described in Schedule 3 to the MOU, which was not publicly filed (ROIVANT stated that Schedules to the MOU would be made available to the SEC upon request).

22.  Finally, the MOU contemplated that ROIVANT would grant Sumitomo rights to two technology platforms it had developed, DrugOme and Digital Innovation (the "Platform Rights").

23.  In exchange for the Company Equity, the ROIVANT Equity, the Options, and the Platform Rights, Sumitomo was to make a cash payment of $3 billion to ROIVANT. The MOU did not indicate any allocation of Sumitomo's $3 billion purchase price among the Company Equity (including the MYOVANT shares), the ROIVANT Equity, the Options, and the Platform Rights to be purchased from ROIVANT.

24.  The parties described the MOU as "non-binding," other than with respect to certain exclusivity and confidentiality restrictions. The MOU further provided that the contemplated transaction, including ROIVANT's sale of MYOVANT shares to Sumitomo, would be subject to numerous material conditions to closing, including ROIVANT's cooperation with Sumitomo's

performance of due diligence, and ROIVANT's agreement to take certain actions necessary to enable Sumitomo to "consolidate, for accounting purposes, all Strategic Alliance Entities [i.e., the 5 entities to be purchased by Sumitomo, including MYOVANT,] at closing." (*See* Ex. A, MOU at p.4 ¶ 4 & p. 6 ¶ 10.)

25.     On or about October 31, 2019, ROIVANT executed a "Transaction Agreement" with Sumitomo governing the transaction contemplated by the MOU. The Transaction Agreement was filed as Ex. 7.04 to ROIVANT's Schedule 13D/A #3 on November 4, 2019; and is appended as Exhibit B to this Third Amended Complaint. As described in the MOU, the Transaction Agreement provided for Sumitomo's acquisition of the Company Equity, the ROIVANT Equity, the Options, and the Platform Rights from ROIVANT, in exchange for Sumitomo's cash payment of $3 billion to ROIVANT.

26.     Section 2.03 of the Transaction Agreement, entitled "Purchase Price Allocation," provided that the Sumitomo "Closing Payment" of $3 billion (less certain transaction costs) "shall be allocated between the ROIVANT Equity, on the one hand, and the Company Equity and the other assets purchased by Sumitomo, on the other hand, as set forth on Section 2.03 of the Sumitomo Disclosure Schedule."

27.     The referenced "Sumitomo Disclosure Schedule" was finalized at or prior to the closing of the Transaction Agreement on December 27, 2019, as further described herein. The Sumitomo Disclosure Schedule, which was not publicly available until ROIVANT filed a copy of it in support of its motion to dismiss Plaintiffs' Second Amended Complaint (*see* Dkt. #39 Ex. 4), is appended as Exhibit C to this Third Amended Complaint.

28.     The Sumitomo Disclosure Schedule records that ROIVANT and Sumitomo agreed to allocate $1 billion of the $3 billion consideration to the purchase of the ROIVANT Equity, with the remaining $2 billion allocated to the purchase of the Company Equity.

29.     The Transaction Agreement defined "Company Equity" to mean ROIVANT's 100% interest in the holding company it formed to transfer its interests in MYOVANT, Urovant, Enzyvant, Altavant, and Spirovant to Sumitomo. The Company Equity conferred no interest in the Options or Platform Rights because ROIVANT transferred those assets to Sumitomo directly, outside the holding company structure. By dividing the entire $3 billion purchase price between the ROIVANT Equity and Company Equity, the Sumitomo Disclosure Schedule treated the Options and Platform Rights as "deal sweeteners" as to which no separate consideration was allocated.

30.     Section 2.03 of the Transaction Agreement further provided:

> The Parties agree that each will report the federal, state, local and foreign income and other Tax consequences of the Transactions in a manner consistent with the Allocation [as defined to refer to the $2 billion Company Equity / $1 billion Roivant Equity allocation provided by the Sumitomo Disclosure Schedule] and take no position in connection with any Tax matter inconsistent with the Allocation, unless otherwise required to do so by applicable Law or a final determination by an applicable Governmental Authority. (Ex. B at p.32)

31.     Accordingly, the Transaction Agreement required the parties to assign a total valuation or allocate a total of $2 billion of the $3 billion purchase price to be paid by Sumitomo under the Transaction Agreement, to the Company Equity, as defined to include: (i) the MYOVANT shares; (ii) the Urovant shares; and the 3 privately held entities to be sold by ROIVANT to Sumitomo. (*See* above ¶ 19.)

32.     The $2 billion price tag for the Company Equity is further confirmed in a press release Sumitomo issued about the deal on October 31, 2019 (attached as Exhibit K). Sumitomo announced that it was acquiring the "[s]hares of five Roivant subsidiaries" for "[a]pproximately

220 billion yen." At the prevailing exchange rate of about 108 yen to the dollar, that purchase price works out to about $2.0 billion — again, just for the Company Equity.

33.     As contemplated in the MOU, the Transaction Agreement executed on October 31, 2019, contained material conditions precedent to closing. One of these conditions was that Sumitomo would be able to consolidate MYOVANT on its books when the transactions closed. In order to facilitate that consolidation (as contemplated by the MOU, *see* above Paragraph 24), ROIVANT agreed to transfer voting control over MYOVANT to Sumitomo.

34.     As stated in the Transaction Agreement, ROIVANT owned 40,765,599 shares, or approximately 45.49%, of MYOVANT's common stock as of October 31, 2019, when both the Transaction Agreement and the Letter Agreement were executed. Accordingly, together with the Transaction Agreement, ROIVANT and Sumitomo also executed a Letter Agreement on October 31, 2019. The Letter Agreement was attached as Ex. 10.1 to MYOVANT's Form 10-Q filed Feb. 10, 2020; and is appended as Exhibit D to this Third Amended Complaint. The Letter Agreement required ROIVANT to transfer "not less than a majority" of MYOVANT's common stock to Sumitomo at or before the closing of the transaction provided in the Transaction Agreement. Accordingly, under the Letter Agreement, ROIVANT committed to "purchasing additional MYOVANT shares at prices not below market trading prices and delivering such shares, or voting rights with respect thereto, to [Sumitomo's] Acquiring Entity."

35.     The requirement that ROIVANT purchase and transfer additional shares or voting rights to Sumitomo at the closing of the Transaction Agreement, as provided by the Letter Agreement, constituted an additional material condition to the closing of the Transaction Agreement, including ROIVANT's sale of MYOVANT shares to Sumitomo.

36.     Sumitomo's obligation to purchase, and ROIVANT's obligation to sell, the 40,765,599 shares of MYOVANT as provided by the Transaction Agreement were contingent at all times following execution and prior to closing on the fulfillment of numerous material conditions — including ROIVANT's fulfillment of the obligation to purchase "additional Myovant shares at prices not below market trading prices and deliver[] such shares, or voting rights" to Sumitomo, as provided by the Letter Agreement. (*See* Ex. D.) For purposes of Section 16(b), ROIVANT's sale of 40,765,599 MYOVANT shares to Sumitomo did not occur until this condition and all other material conditions provided by the Transaction Agreement were satisfied, at the closing of the transaction on December 27, 2019.

### C.     ROIVANT's Purchase of "TOP-UP SHARES"

37.     In order to fulfill ROIVANT's commitment under the Letter Agreement to purchase additional shares and deliver the shares or associated voting rights to Sumitomo, ROIVANT purchased a total of 4,243,005 shares of MYOVANT (the "TOP-UP SHARES") in the interval between the execution of the Transaction Agreement on October 31, 2019, and the closing of the Transaction Agreement on December 27, 2019. The following Paragraphs 38-40 describe these purchases.

38.     On (or about) November 25, 2019, ROIVANT purchased 3,500,000 shares of the common stock of MYOVANT at a price of $15.00 per share, or a total purchase price of $52,500,000.00 (more or less), from Millennium Pharmaceuticals, Inc., an entity with principal offices at: 40 Lansdowne Street, Cambridge, Massachusetts 02139.

39.     Between November 20, 2019, and December 17, 2019 (inclusive), ROIVANT purchased 743,005 additional shares (more or less), through the facilities of the New York Stock Exchange, a National Securities Exchange located within the District, or through dark pools or other facilities located within the District, as follows:

| Purchase Date | Shares Purchased | Purchase Price (per share) | Total Purchase Price |
|---|---|---|---|
| November 20, 2019 | 121,906 | $12.90 | $1,572,587.40 |
| November 21, 2019 | 103,613 | $11.80 | $1,222,633.40 |
| November 21, 2019 | 18,293 | $12.38 | $226,467.34 |
| December 2, 2019 | 113,668 | $18.21 | $2,069,894.28 |
| December 2, 2019 | 65,525 | $18.85 | $1,235,146.25 |
| December 4, 2019 | 72,471 | $17.04 | $1,234,905.84 |
| December 4, 2019 | 2,529 | $17.56 | $44,409.24 |
| December 16, 2019 | 131,541 | $14.97 | $1,969,168.77 |
| December 16, 2019 | 38,459 | $15.68 | $603,037.12 |
| December 17, 2019 | 75,000 | $15.94 | $1,195,500.00 |
| | | | |
| **Total Shares Purchased:** | **743,005** | **Total Price Paid:** | **$11,373,749.64** |

40.     The total price ROIVANT paid for the 4,243,005 TOP-UP SHARES purchased as described in Paragraphs 38-39 above was $11,373,749.64 + $52,500,000.00 = $63,873,749.64.

41.     ROIVANT delivered the 4,243,005 TOP-UP SHARES to Sumitomo at the closing of the Transaction Agreement on December 27, 2019. No cash was paid for the TOP-UP SHARES. Under the Transaction Agreement, Sumitomo's cash payment obligations had been limited to the 40,765,599 MYOVANT shares owned by ROIVANT "as of the Agreement Date" of October 31, 2019.

42.     The parties' rights in the TOP-UP SHARES were governed instead by a "Share Return Agreement" signed by ROIVANT and Sumitomo at the closing of the Transaction Agreement on December 27, 2019. The Share Return Agreement was filed as Exhibit 7.06 to ROIVANT's Schedule 13D/A #5; and is appended as Exhibit E to this Third Amended Complaint. (A copy was also filed with this Court at Dkt #35-1 at p.175.)

43.     Under the Share Return Agreement, legal title to the TOP-UP SHARES passed to the Sumitomo entities, but essentially all the pecuniary benefits of share ownership were to be paid to ROIVANT by the Sumitomo entities during the agreement's term. The Sumitomo entities

acquired and retained all voting power but not the power to alienate or hypothecate. Additionally, the Share Return Agreement provided ROIVANT with the right to reacquire the TOP-UP SHARES upon the happening of certain defined events – *e.g.*, the Sumitomo entities acquiring sufficient MYOVANT shares to maintain their 50% plus ownership without needing some or all of the TOP-UP SHARES.

44.     By delivering the TOP-UP SHARES to Sumitomo subject to the Share Return Agreement, ROIVANT completed the performance of its obligations under the Letter Agreement described in Paragraph 34 above, which constituted a material condition to closing the Transaction Agreement. Upon execution of the Share Return Agreement and the closing of the Transaction Agreement on December 27, 2019, ROIVANT's 40,765,599 MYOVANT shares were sold to Sumitomo.

### D.     Calculation of ROIVANT's Profit

45.     While the purchase prices ROIVANT paid for the TOP-UP SHARES are matters of public record, ROIVANT has never disclosed a sale price for the 40,765,599 MYOVANT shares it sold to Sumitomo.

46.     Of the $3 billion in total consideration that Sumitomo agreed to pay, the Sumitomo Disclosure Schedule allocated $2 billion to the Company Equity. The Company Equity, however, included ROIVANT's interest in MYOVANT plus four other Vants. (*See* Ex. C.) To price ROIVANT's sale of its MYOVANT stake, the $2 billion in consideration that Sumitomo gave for the Company Equity must be further allocated in some way between ROIVANT's stakes in MYOVANT and the other four Vants.

47.     ROIVANT and Sumitomo prepared their own internal valuations of MYOVANT when they negotiated the MOU. ROIVANT has also prepared financial statements and tax returns

accounting for the capital gain it realized on the sale of its MYOVANT shares and the tax due thereon.

48.     In addition, the Transaction Agreement required ROIVANT to prepare an "Independent Appraisal" of each of the three privately-owned Vants (Enzyvant, Altavant, and Spirovant) for Sumitomo's review prior to closing. The Transaction Agreement refers to a Roivant Disclosure Schedule (which ROIVANT failed to disclose publicly) for further information on the Independent Appraisals. (*See* Ex. B § 7.11(e) at p.103 & § 1.01(a) at p.15.) The Independent Appraisals, the Roivant Disclosure Schedule, and the complete set of Transaction Agreement documents (including relevant ancillary agreements executed or required by the Transaction Agreement) will be probative of the value assigned to the components of the Company Equity, including the 40,765,599 MYOVANT shares sold by ROIVANT, at the closing of the Transaction Agreement.

49.     ROIVANT has doggedly refused to disclose any of these valuations, accountings, and appraisals, despite Plaintiffs' requests and even though disclosure of a low sale price for the MYOVANT shares would undermine Plaintiffs' allegations that ROIVANT's trades were profitable.

50.     Instead, ROIVANT has insisted that its MYOVANT shares should be valued at $5.46 per share, the closing market trading price on October 31, 2019, the date the Transaction Agreement was signed. (*See, e.g.,* Brief in Support of Motion to Dismiss, Dkt #38 p.17.)

51.     The market value of MYOVANT stock on October 31, 2019, grossly understates the price Sumitomo agreed to pay for the MYOVANT shares because it does not reflect material nonpublic information known to ROIVANT and Sumitomo when the price was negotiated.

52.     Sumitomo agreed to pay a substantial premium to market because it had exclusive access to pre-publication data from the Phase III clinical trial of relugolix, MYOVANT's blockbuster new drug candidate.

53.     Additionally, because ROIVANT was in possession of material non-public information concerning the positive results of the relugolix trial long before the Transaction Agreement and the Letter Agreement were executed on October 31, 2019, ROIVANT was restricted from purchasing the TOP-UP SHARES at market prices, as required by the Letter Agreement and as a condition to closing the Transaction Agreement, until after the results of the trial were publicly disclosed on November 19, 2019.

54.     When the trial results were publicly announced on November 19, 2019, MYOVANT's stock soared. The stock rocketed to $12.92 per share on the day of the announcement, a 113% increase over the previous day's $6.06 closing price. The ascent continued over the next two weeks as the market absorbed the news, with the stock reaching a high of $19.21 per share on December 2, 2019. (*See* historical trading data attached as Exhibit L to this Third Amended Complaint).

55.     Substantially all of the information the market learned on November 19, 2019 was known to Sumitomo when the MOU was signed on September 6. Sumitomo got that information from ROIVANT.

56.     ROIVANT had early access to data from the relugolix trial through its representatives on MYOVANT's board and otherwise. At the time the MOU was signed, MYOVANT's seven-member board included three ROIVANT representatives. Among these were Vivek Ramaswamy, then ROIVANT's CEO and the chief architect of the Sumitomo deal.

57.     ROIVANT's oversight of the relugolix study is referenced in the pre-closing obligations provided by Section 7.03 of the Transaction Agreement. Section 7.03(a) obligated ROIVANT to "cause each member of the Public Entity Group" — i.e., MYOVANT and Urovant — to "continue its clinical trials being conducted as of the Agreement Date," at least "to the extent commercially reasonable to do so."  Section 7.03(c) further obligated ROIVANT to "cause each member of the Public Entity Group" to "use commercially reasonable efforts to: (i) diligently conduct all ongoing research and development, manufacturing and commercializing activities with respect to their Product Candidates in compliance with all applicable Laws."  (*See* Ex. B p.96.)

58.     In the case of MYOVANT, the performance of these obligations depended on ROIVANT's ability to control the "conduct" of the relugolix trial — i.e., the drug's "ongoing research and development."  Had the trial been hands-off to ROIVANT, then ROIVANT would have obligated itself to do something it had no power to do. ROIVANT's domination of the MYOVANT board gave it sway over the clinical trial and privileged access to all the data it produced.

59.     ROIVANT also had a more direct channel to the relugolix trial data. It had early access to the data because MYOVANT had agreed to let ROIVANT run the trial as described in the following paragraphs.

### 1.     <u>Background on Relugolix</u>

60.     Relugolix is a once-daily, oral gonadotropin-releasing hormone (GnRH) receptor antagonist used to treat prostate cancer in men and certain gynecological disorders in women. It is marketed under the brand names Relumina or Orgovyx. (*See* Ex. F; *see also* Myovant Form 8-K filed 12/28/2020).

61.     Relugolix was MYOVANT's leading drug candidate and one of only two drugs in its pipeline. For perspective on the relative importance of relugolix to MYOVANT's prospects,

Figure 1 below reproduces a table from an analysis published on September 6, 2019 (the same day the MOU was signed) by pharmaceutical tracking firm Evaluate.

| Things we know: what Sumitomo is buying for $3bn | | | | | |
|---|---|---|---|---|---|
| **Project** | **Company** | **Source** | **Use** | **NPV ($m)** | **Ownership** |
| RVT-802 | Enzyvant | Duke Uni | Paediatric congenital athymia (filed) | NA | 100% |
| Relumina | Myovant | Takeda | Uterine fibroids (ph3)<br>Endometriosis (ph3)<br>Prostate cancer (ph3) | 1,543 | 46% |
| Vibegron | Urovant | Merck & Co | Overactive bladder (ph3)<br>IBS-associated pain (ph2) | 623 | 75% |
| Rodatristat | Altavant | Karos | PAH (ph2)<br>IPF (ph2)<br>Sarcoidosis (ph2) | 0 | 100% |
| MVT-602 | Myovant | Takeda | Female infertility (ph2) | 16 | 46% |
| URO-902 | Urovant | Ion Channel Innovations | Overactive bladder (ph2) | 0 | 75% |
| RVT-801 | Enzyvant | Duke Uni | Acid ceramidase deficiency (ph1) | 0 | 100% |

*Note: excludes a fifth, undisclosed "vant" and undisclosed options over six other entities. Source: company presentations & EvaluatePharma.*

**Figure 1.  Source: Jacob Plieth, "Sumitomo bets on Roivant to solve its patent expiry woes,"**
**Evaluate.com (Sept. 6, 2019),** *available at* **https://www.evaluate.com/vantage/articles/news/deals/**
**sumitomo-bets-roivant-solve-its-patent-expiry-woes (last visited Feb. 8, 2021) (attached as Exhibit F)**

62.     Based on company presentations and its own research, Evaluate estimated the net present value ("NPV") of Relumina (relugolix) at $1.543 billion — more than 96 times the $16 million in estimated NPV for MVT-602, MYOVANT's only other drug candidate.

63.     The Evaluate analysis also reflects that ROIVANT's interest in MYOVANT was the most valuable asset transferred to Sumitomo through the Company Equity.

### 2.     The Phase III Trial

64.     At the time the MOU was executed, relugolix was the subject of a Phase III clinical trial to determine its efficacy and safety in comparison with another gonadotropin-releasing hormone (GnRH) agonist known as leuprolide. The trial was completed on October 25, 2019, days

before the Transaction Agreement was executed on October 31. (*See* NIH summary attached as Exhibit G.)

65.     Though formally sponsored by Myovant Sciences GmbH (a wholly owned subsidiary of MYOVANT), the study was actually overseen by ROIVANT.

66.     ROIVANT oversaw the relugolix study through its wholly owned subsidiary Roivant Sciences, Inc. under an Amended and Restated Services Agreement effective November 11, 2016 among Roivant Sciences, Inc., MYOVANT, and two MYOVANT subsidiaries (the "Services Agreement") (attached as Exhibit H).

67.     The Services Agreement gave Roivant Sciences, Inc. authority to "[d]evelop a plan for clinical testing," to "[m]anage and oversee clinical trials and drug manufacturing," and to "[g]ather and analyze data obtained in connection with clinical trials." (Ex. H Appx. A §§ 2(i) & (j)).

68.     Acting under that authority through its subsidiary, ROIVANT had helped design the relugolix study and was regularly gathering and reviewing the data it produced.

69.     By the time the MOU was signed, the vast majority of that data had been collected. Even though the trial was still ongoing, ROIVANT had essentially all the information it needed by September 2019 to conclude that relugolix was going to be a knockout success.

70.     To understand how ROIVANT could know the outcome while the trial was still ongoing, some discussion of the trial protocol is necessary.

### 3.     Trial Data and Collection Methods

71.     The "primary end point" of the relugolix study — that is, the primary clinical outcome to be measured — was "sustained testosterone suppression to castrate levels (<50 ng per deciliter) through 48 weeks." Key secondary endpoints included (a) noninferiority with respect to

the primary endpoint; (b) castrate levels of testosterone on day 4 of the study; and (c) profound castrate levels of testosterone (<20 ng per deciliter) on day 15. (*See* Ex. J at p.2187.)

72.    Patients had to satisfy eligibility criteria for enrollment in the study. According to the published protocol, eligibility was assessed in a screening period of up to 28 days. Qualifying patients began treatment immediately, with treatment lasting 48 weeks. Figure 2, published with the study protocol, illustrates this chronology:



**Figure 2. Source: Clinical Study Protocol: HERO (MVT-601-3201) amend. 3 (Oct. 23, 2018),**
***available at* https://www.nejm.org/doi/suppl/10.1056/NEJMoa2004325/suppl_file/**
**nejmoa2004325_protocol.pdf (last visited Feb. 8, 2021) (excerpt attached as Exhibit I, *see* p.42)**

73.    As the figure shows, patient testosterone levels were measured at four-week intervals during the 48-week treatment period. Each patient also made a "safety follow-up" visit 30 days after treatment ended, and a small subset were monitored for an additional 60 days to assess recovery of their testosterone levels.

74.    A total of 930 participants were ultimately enrolled in the study. They were randomly assigned to the alternative treatments in a two-to-one ratio, with 622 receiving relugolix and 308 receiving leuprolide. (Ex. J at p.2192.)

75.    Although patients were assigned to the two groups randomly, the assignments were not blind. Blinding was not possible because the two drugs are administered differently: relugolix is taken orally once a day, while leuprolide is injected at multiweek intervals.

76.    It took ROIVANT 18 months to get the study fully enrolled. Screening began in April 2017 and was closed by October 2018. (Ex. J. at p. 2189.)

77.    Because treatment lasted 48 weeks and began immediately after enrollment, only the very last enrollees were still receiving treatment when the MOU was finalized in September 2019. The vast majority had already completed treatment, and ROIVANT had collected their data.

78.    Even for the few study participants who were still being treated, the vast majority of their data had been collected before September 2019. A patient enrolled in October 2018 (the final month of screening) would have been in treatment for over 40 weeks by the time the MOU was signed. That final patient would have had at most two treatment visits left.

79.    By the time the MOU was signed, therefore, ROIVANT could already see a complete data set on most of the key secondary endpoints. Those endpoints were measured in the first few weeks of treatment (*see* Ex. J at p.2187), mile-markers that all enrolled patients had passed by September 6, 2019. By that time, ROIVANT had perfect knowledge that relugolix was superior to leuprolide with respect to (a) the cumulative probability of castration levels of testosterone on day 4 (56.0% vs. 0%); (b) the cumulative probability of castration levels of testosterone on day 15 (98.7% vs. 12.0%); and (c) testosterone suppression to profound castrate levels (<20 ng per deciliter) on day 15 (78.4% vs. 1.0%). (Ex. J at p.2191.)

80.     Even with respect to the other endpoints, ROIVANT had jackpot evidence of relugolix's superiority by September 2019. It already had complete data from the vast majority of the enrolled patients, and it had the vast majority of the data from the few remaining patients still in treatment. (Ex. J at p.2191.)

81.     The data available on September 6, 2019 were especially compelling because relugolix's superiority was revealed so early in treatment. To see how stark the pattern was, consider Figure 3, originally published by the *New England Journal of Medicine* in June 2020:



**Figure 3. Source: Neal D. Shore, M.D. et al., Oral Relugolix for Androgen-Deprivation Therapy, Advanced Prostate Cancer, 382 N. Eng. J. Med. 2187, 2192 fig. 1B (June 4, 2020),** *avail. at* **https://www.nejm.org/doi/pdf/10.1056/NEJMoa2004325?articleTools=true (last visit Feb. 8, 2021) (Ex. J)**

82.     As the figure shows, the superior efficacy of relugolix was plain from the earliest weeks of treatment. Mean testosterone levels of patients treated with relugolix cratered immediately after treatment began, while those treated with leuprolide actually rose from baseline. The leuprolide cohort did not see a significant reduction until week 3, and it was not until week 5 that their mean testosterone levels settled to levels comparable to the relugolix group.

83.     After these early weeks, the two groups responded comparably and consistently, with both cohorts bottoming to minimal levels by week 17. The remaining data were so monotonous that the journal did not even illustrate most of it, truncating the graph between weeks 17 and 41.

84.     The rapid therapeutic response meant that the superior efficacy of relugolix was evident within the first few weeks of treatment. While the last patients who joined the study in October 2018 still had a few weeks of treatment left in September 2019, their testosterone levels at that point were already flatlining, and had been for months.

85.     In sum, ROIVANT had all the data it needed by September 2019 to conclude that relugolix had met its primary endpoint and all key secondary endpoints. Even though MYOVANT would not formally announce the full results of the study until November, ROIVANT already knew in September that the drug was a grand slam.

### 4.     Disclosure of the Relugolix Results to Sumitomo

86.     Because ROIVANT learned the relugolix results through its privileged position as a MYOVANT fiduciary and contractor, it could not negotiate the sale of its MYOVANT shares without first disclosing the results to Sumitomo. "[C]ourts have consistently held that insiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment." *Chiarella v. United States*, 445 U.S. 222, 227 (1980) (quoting *Cady, Roberts & Co.*, 40 SEC 907 (1961)).

87.     Consistent with the so-called "disclose or abstain" rule, the MOU and the Transaction Agreement obligated ROIVANT to cooperate with Sumitomo's performance of due diligence by providing Sumitomo with ongoing access to MYOVANT's business records and sharing information relevant to MYOVANT's valuation with Sumitomo throughout the "pre-

closing" period. The information ROIVANT shared with MYOVANT in connection with the MOU and the Transaction Agreement included the information known to ROIVANT concerning the success of the relugolix trial.

88.    Even without a legal and contractual duty to disclose, ROIVANT had every incentive to disclose this information to Sumitomo. Relugolix was MYOVANT's leading drug candidate, and the company's prospects hinged on its success. Evidence of success in a late-stage clinical trial would be rewarded with a hefty price hike on ROIVANT's sale of MYOVANT shares.

89.    As previously alleged, MYOVANT's stock price jumped 113% the day the relugolix results were announced. That one-day increase alone added more than $279 million to the value of ROIVANT's 40,765,599-share hoard. Had ROIVANT kept the relugolix data under wraps, it would have left hundreds of millions of dollars in transaction value on the table.

90.    Since a small number of trial participants were still in treatment in September 2019, some data had yet to be collected and analyzed when the MOU was signed. The agreement was left nonbinding to allow Sumitomo to "complete its diligence process to its full satisfaction prior to entering into any of the Strategic Alliance Agreements." (*See* Ex. A, MOU at pp.6-7 ¶ 10.) ROIVANT was obligated to "cooperate to provide information which Sumitomo deems reasonably necessary for completion of its due diligence."

91.    This nonbinding diligence period gave Sumitomo time to review the few remaining data points left as the last trial participants completed treatment. It also gave Sumitomo an opportunity to complete its own statistical analysis of the raw data and get a sneak peek at the full results to be published in November.

92.     Sumitomo's due diligence confirmed that relugolix was the real deal. The parties signed the Transaction Agreement on October 31, 2019, adopting the price Sumitomo had negotiated a month earlier based on the preliminary data from the relugolix trial.

### 5.     Purchase Price Allocation

93.     Because ROIVANT has rebuffed Plaintiffs' request for production of its own accounting for the MYOVANT sale, it is not possible to plead a precise allocation of the $2 billion Sumitomo paid for the Company Equity. The exact amount of ROIVANT's profit, which depends on that allocation, cannot be calculated with certainty and is estimated for purposes of this Third Amended Complaint, subject to revision following discovery.

94.     Publicly available information indicates that ROIVANT's shares in MYOVANT accounted for an outsized portion of the purchase price paid for the Company Equity. MYOVANT was by far the largest of the five Vants packaged in the Company Equity, and it was the only Vant other than Urovant seasoned enough to have gone public. According to publicly available sources, MYOVANT had about as many employees as the other four Vants combined.

95.     When the Transaction Agreement closed on December 27, 2019, Sumitomo purchased 40,765,599 MYOVANT shares, excluding the top-up shares whose economic rights remained with ROIVANT. MYOVANT's publicly traded common shares closed that day at $15.81 per share. (*See* Ex. L.) At that price, ROIVANT's 40,765,599 shares had a market value of $644,504,120.19 on December 27, 2019, after the market had fully digested the relugolix results known only to ROIVANT and Sumitomo until November 19, 2019.

96.     The stock price of Urovant, the other public Vant whose shares Sumitomo purchased, closed at $13.33 on December 27, 2019. At that price, ROIVANT's 22,860,013-share stake in Urovant was worth about $305 million.

97. The remaining three Vants were small and still in the venture stage. When Evaluate reported on Altavant and Enzyvant in September 2019, it appraised the net present value of every project in their pipelines at either $0 or "NA." The third, Spirovant, had no drug candidates in clinical development.

98. Lavishing the three private Vants with a total valuation of $600 million would return a sum-of-the-parts valuation for the entire Company Equity of $644m + $305m + $600m = $1.549 billion. ROIVANT's stake in MYOVANT would account for $644m ÷ $1,549m = 41.5% of that total.

99. At 41.5% of the $2 billion total purchase price for the Company Equity, ROIVANT's stake in MYOVANT would therefore be worth $830 million, or $830m ÷ 40,765,599 = $20.36 per share.

100. Matched with its purchase of the top-up shares, ROIVANT's sale of a like number of MYOVANT shares to Sumitomo at $20.36 per share netted it a short-swing profit of over $22 million.

101. A profitable swing trade is also apparent from the contemporaneous price of MYOVANT's publicly traded shares. ROIVANT tries to conjure up a loss by pointing to the market price of MYOVANT's common stock on October 31, 2019, but that price, as explained earlier, does not account for the blowout relugolix trial results known to Sumitomo when it negotiated the deal. By the time the deal closed, the market had learned the results of the relugolix trial, and MYOVANT's stock price had exploded.

102. Between the announcement of the results on November 19, 2019 and the closing of the Transaction Agreement on December 27, 2019, the closing trading price of MYOVANT ranged from $12.43 per share on November 21, 2019, to $19.21 per share on December 2, 2019. The

lowest price ROIVANT paid for its TOP-UP SHARES was $11.80 on November 21, 2019. Even if ROIVANT's sale were valued at the lowest closing price during this time period, therefore, it would still be profitably matched with at least one "top-up" purchase.

103.    A high price tag for MYOVANT's shares also finds support in analyst reaction to the relugolix results. In a report on November 19, 2019 (the day the results were announced), JMP Securities raised its MYOVANT price target from $25 to $34 per share.

104.    A report that same day from Goldman Sachs boosted the firm's price target from $18 to $20 per share.

105.    Neither of these targets can be squared with ROIVANT's wishful sale price of $5.46 per share.

106.    Projections on MYOVANT's drug pipeline also justify an outsized allocation of the purchase price. According to Evaluate's September 2019 report, MYOVANT's projects in development were expected to account for over 71% of the combined net present value of the notable projects under development by all four Vants subject to the MOU. *See* supra Figure 1. Even when adjusted to reflect ROIVANT's less-than-100% interests in MYOVANT and Urovant, MYOVANT's projects stood to account for over 60% of the total net present value flowing to Sumitomo via the Company Equity. *See supra* Figure 1.

107.    If MYOVANT accounted for a like share of the $2 billion Sumitomo paid for the Company Equity, then ROIVANT's 40,765,599 MYOVANT shares would be valued at $1.2 billion, or about $29.43 per share.

108.    The Evaluate figures do not account for Spirovant, which the parties had not yet settled on as the fifth Vant Sumitomo was purchasing. As explained earlier, however, Spirovant was the smallest of the Vants Sumitomo acquired and made little contribution to the value of the

Company Equity. Unlike all the other Vants subject to the Transaction Agreement, Spirovant did not even have a drug candidate in clinical development. According to the press release Sumitomo filed on October 31, 2019, *see supra* ¶ 31, Spirovant had only been formed in February 2019, and had $0 in share capital as of March 31, 2019, just seven months earlier.

109.    But even under the preposterous assumption that Spirovant accounted for a full fifth of the $2 billion Sumitomo paid for the Company Equity, that left $1.6 billion to be allocated among ROIVANT's interests in the remaining four Vants. Assigning 60% of that consideration to MYOVANT in line with its contribution to projected net present value would price ROIVANT's stake at $960 million, or about $23.55 per share.

110.    At that price, ROIVANT realized a total short-swing profit on its MYOVANT stake of just over $36 million.

111.    Finally, a profit is returned by valuing MYOVANT in proportion to its contribution to the total assets of the Vants included in the Company Equity.  The total assets of each of the five Vants is known because Sumitomo disclosed them in the press release it filed just after execution of the Transaction Agreement. *See supra* ¶ 31.

112.    The following table lists the book value of the total assets for each of the five Vants as of March 31, 2019, the last date for which audited balance sheet data was available before the signing of the Transaction Agreement:

|  | | Sumitomo Share | |
| --- | --- | --- | --- |
|  | **Total Assets** | **(%)** | **($)** |
| Myovant | $173,000,000 | 45% | $77,850,000 |
| Urovant | $100,100,000 | 75% | $75,075,000 |
| Enzyvant | $14,400,000 | 100% | $14,400,000 |
| Altavant | $17,200,000 | 100% | $17,200,000 |
| Spirovant | $0 | 100% | $0 |

**Table 1.  Asset values for the five Vants as of March 31, 2019, as disclosed
by Sumitomo. The final two columns multiply the asset values by Sumitomo's
percentage investment in each Vant.  Spirovant was not formed until 2019.**

113.   The final two columns of the table adjust the reported figures to reflect Sumitomo's

proportionate share of MYOVANT's and Urovant's assets, since Sumitomo was purchasing less

than 100% of those Vants.  So adjusted, the assets of the five Vants purchased by Sumitomo had

an approximate total book value of $184,525,000. MYOVANT's assets accounted for $77,850,000,

or 42.2% of the total.

114.   Allocating Sumitomo's purchase price in the same proportion yields a sale price of

approximately $(0.422 \times \$2,000,000,000) = \$844$ million for ROIVANT's shares of MYOVANT,

or about $20.70 per share.  At that sale price, ROIVANT realized a short-swing profit of about

$24 million.

115.   In short, ROIVANT did not and would not sell its MYOVANT stake to Sumitomo

for $5.46 per share. That derisory price ignores high-value information about MYOVANT's

leading drug candidate, information that was known to both seller and buyer when the actual price

was negotiated. Under any reasonable valuation, ROIVANT made a profitable short-swing trade.

### 6.    The Control Premium

116.   The market price of MYOVANT common stock on October 31, 2019 or any other

date also lowballs the true price ROIVANT received for another reason: it does not include the

control premium Sumitomo had to pay. Sumitomo was not just buying stock; it was buying control.

The delivery of the TOP-UP SHARES and execution of the Share Return Agreement were steps

in a conscious plan to hand Sumitomo control of MYOVANT. To acquire this controlling block of

stock, Sumitomo would have to pay a premium to market.

117.   The assigning of a control premium to shares sold where, as here, control of an

issuer has a special value attributable to the control element, is the law of this circuit: *Newmark v.*

*RKO General, Inc.*, 425 F. 2d 348, 357 (2d Cir.), *cert. denied*, 400 U.S. 854 (1970); *Essex Universal Corp. v. Yates,* 305 F. 2d 572, 576 (2d Cir. 1962); *T-Bar Inc. v. Chatterjee,* 693 F. Supp.1, 7 (S.D.N.Y. 1988); *Schur v. Salzman,* 365 F. Supp. 725, 730 (S.D.N.Y. 1973).

118.    Consistent with the statutory remedial purpose served by maximizing short-swing profits subject to disgorgement, Plaintiffs estimate the baseline market value of ROIVANT's stake in MYOVANT at $19.21 per share. That is the stock's highest closing price during the two-month period between the signing of the Transaction Agreement on October 31, 2019 and the closing of the deal on December 27, 2019.

119.    Plaintiffs add a minimum 15% control premium to the market value, reserving the right to establish through expert testimony and other proofs a larger control premium, for a total sale price per share of $19.21 × (1 + 0.15) = $22.0915. At that price, ROIVANT received a total of $900,573,230 for its 40,765,599 MYOVANT shares. That amount works out to about 45.0% of the $2 billion in total consideration that the parties to the Transaction Agreement allocated to the Company Equity. *See* Ex. C.

120.    Plaintiffs now calculate ROIVANT's Section 16(b) liability as follows:

- Total MYOVANT shares sold by ROIVANT to Sumitomo on December 27, 2019: 40,765,599

- Total MYOVANT shares purchased by ROIVANT within less than six months: 4,243,005

- Total sale price received for 4,243,005 shares at $22.0915 per share: $93,734,344.96

- Total purchase price paid for 4,243,005 shares: $63,873,749.64

- **Estimated short-swing profit** (total sale price – total purchase price):

    $93,734,344.96 – $63,873,749.64 = **$29,860,595.32**

121.    In the alternative, the sale price on ROIVANT's stake in MYOVANT may be estimated at the market value of the stock on December 27, 2019, the day the Transaction Agreement closed and ROIVANT sold the MYOVANT shares to Sumitomo for purposes of Section 16(b). The market value on December 27, 2019 impounded all available information at the time of sale, including the relugolix results announced a month earlier, and thus serves as a reasonable estimate of what the parties to the Transaction Agreement thought MYOVANT was worth when the transaction occurred, and the portion of the $2 billion purchase price ascribed to the Company Equity that was specifically allocated as the price for the MYOVANT shares included in the Company Equity (i.e., ROIVANT's sale price for the MYOVANT shares). (*See* Ex. C, Sumitomo Disclosure Schedule).

122.    MYOVANT's publicly traded common shares closed at $15.81 per share on December 27, 2019, with an intraday range of $15.70 to $16.50 per share. Plaintiffs allege the midpoint of that range, or $16.10 per share, as an alternative reasonable estimate of the base price ROIVANT received for its 40,765,599 MYOVANT shares sold that day.

123.    To that base price must be added a minimum 15% control premium as described above, for a total sale price per share of $16.10 × (1 + 0.15) = $18.515. At that price, ROIVANT received a total of $754,775,065 for its 40,765,599 MYOVANT shares. That amount works out to about 37.7% of the $2 billion in total consideration that the parties to the Transaction Agreement allocated to the Company Equity.

124.    Under this alternative estimated sale price, Plaintiffs calculate ROIVANT's Section 16(b) liability as follows:

- Total MYOVANT shares sold by ROIVANT to Sumitomo on December 27, 2019: 40,765,599

- Total MYOVANT shares purchased by ROIVANT within less than six months at prices below $18.515 per share: 4,177,480

- Total sale price received for 4,177,480 shares at $18.515 per share: $77,346,042.20

- Total purchase price paid for 4,177,480 shares: $62,638,603.39

- **Estimated short-swing profit** (total sale price – total purchase price):

    $77,346,042.20 – $62,638,603.39 = **$14,707,438.81**

## FIRST CLAIM FOR RELIEF:

125.    All that has been pled before is realleged.

126.    ROIVANT's sale of 40,765,599 MYOVANT common shares to Sumitomo at the closing of the Transaction Agreement on December 27, 2019, may be matched with ROIVANT's private and open market purchases of MYOVANT's common shares less than six months earlier.

127.    Plaintiffs estimate that ROIVANT realized a short-swing profit of at least $14,707,438.81 from its purchases and sale of MYOVANT's common shares within a period of less than six months. Plaintiffs' estimate of ROIVANT's profits from these transactions is subject to revision following discovery of relevant transaction documents confirming the price ascribed to the MYOVANT shares sold by ROIVANT (including, without limitation, tax returns and other accounting documents reflecting the price ascribed to the MYOVANT shares sold; the Roivant Disclosure Schedule including the Independent Appraisals of the three privately-owned entities included in the Company Equity; and expert testimony to the extent required to support the reasonableness of the price ascribed by the parties to the MYOVANT shares).

128.    ROIVANT's profit inured to MYOVANT's benefit and is recoverable by Plaintiffs in its name and stead, MYOVANT having failed to prosecute recovery of the same within 60 days of Plaintiffs' demands.

    **WHEREFORE**, Plaintiffs demand judgment:

a)   Requiring ROIVANT to account for and to pay over to MYOVANT the short swing profits realized and retained in violation of Section 16(b) of the Act, together with appropriate interest and the costs of this suit;

b)   Awarding to Plaintiffs their costs and disbursements, including fair and reasonable attorneys', accountants, and expert witness fees; and

c)   Granting to Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: Southampton, NY
        February 10, 2021

                                              Yours, etc.

                                              *s/ David Lopez*
                                              _____
.                                             David Lopez, Esq.


*s/ James A. Hunter*                          *s/ Miriam Tauber*
_____              _____
James A. Hunter, Esq.                         Miriam Tauber, Esq